## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION


| | | |
|---|---|---|
| **MARK E. MILLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **V.** | ) | **Case No. 2:15CV02NCC** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner denying the application of Mark E. Miller (Plaintiff) for Supplemental Security Income (SSI), under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 et seq. Plaintiff has filed a brief in support of the Complaint. (Doc. 16). Defendant has filed a brief in support of the Answer. (Doc.19). The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c). (Doc. 9).

## I.
## PROCEDURAL HISTORY

On December 20, 2011, Plaintiff filed an application for SSI alleging a disability onset date of November 24, 2009. (Tr. 191-96). His application was denied, and he requested a hearing before an Administrative Law Judge (ALJ).

(Tr. 125, 145). After a hearing, by decision, dated August 20, 2013, the ALJ found Plaintiff not disabled. (Tr. 50-69). On December 5, 2014, the Appeals Council denied Plaintiff's request for review. (Tr. 1-3). As such, the ALJ's decision stands as the final decision of the Commissioner.

## II.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari,

250 F.3d 603, 605 (8th Cir. 2001) (citing <u>Nguyen v. Chater</u>, 75 F.3d 429, 430-31 (8th Cir. 1996)).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); pt. 404, subpt. P, app. 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. <u>See</u> <u>id.</u>

Fourth, the impairment must prevent the claimant from doing past relevant work. 20 C.F.R. §§ 416.920(f), 404.1520(f). The burden rests with the claimant at this fourth step to establish his or her Residual Functional Capacity (RFC). <u>See</u> <u>Steed v. Astrue</u>, 524 F.3d 872, 874 n.3 (8th Cir. 2008) ("Through step four of this analysis, the claimant has the burden of showing that she is disabled."); <u>Eichelberger</u>, 390 F.3d at 590-91; <u>Masterson v. Barnhart</u>, 363 F.3d 731, 737 (8th Cir. 2004); <u>Young v. Apfel</u>, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).

Fifth, the severe impairment must prevent the claimant from doing any other work. 20 C.F.R. §§ 416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to show evidence of other jobs in the national economy that can be performed by a person with the claimant's

RFC.  See Steed, 524 F.3d at 874 n.3; Young, 221 F.3d at 1069 n.5.  If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant."  Id.  See also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC.").  Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the decision must be affirmed if it is supported by substantial evidence.  See Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).  See also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).  In Bland v. Bowen, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> The concept of substantial evidence is something less than the weight
> of the evidence and it allows for the possibility of drawing two

> inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

See also Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision.") (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)); Hartfield v. Barnhart, 384 F.3d 986, 988 (8th Cir. 2004) ("[R]eview of the Commissioner's final decision is deferential.").

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. See Cox, 495 F.3d at 617; Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1993); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. See Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. See Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence

may also support an opposite conclusion or because the reviewing court would have decided differently. See Krogmeier, 294 F.3d at 1022. See also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001).

To determine whether the Commissioner's final decision is supported by substantial evidence, the court is required to review the administrative record as a whole and to consider:

(1) Findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

Additionally, an ALJ's decision must comply "with the relevant legal requirements." Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A). "While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

When evaluating evidence of pain, the ALJ must consider:

(1) the claimant's daily activities;

(2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;

(3) any precipitating or aggravating factors;

(4) the dosage, effectiveness, and side effects of any medication; and

(5) the claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322.

The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. See id. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating

and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. See Polaski, 739 F.2d at 1322; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him or her to reject the plaintiff's complaints. See Guilliams, 393 F.3d at 801; Masterson, 363 F.3d at 738; Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he or she considered all of the evidence. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992); Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). See also Steed, 524 F.3d at 876 (citing Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)). The ALJ need only acknowledge and consider those factors. See id. Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. See Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a)(1), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The Commissioner must show

that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. See Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006); Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc)). The Commissioner must first prove that the claimant retains the RFC to perform other kinds of work. See Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857. The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. See Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert (VE) may be used. An ALJ posing a hypothetical to a VE is not required to include all of a plaintiff's limitations, but only those which the ALJ finds credible. See Goff, 421 F.3d at 794 ("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical."); Rautio, 862 F.2d at 180. Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. See Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006); Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell v. Sullivan, 892 F.2d 747, 750 (8th Cir. 1989).

# III.
## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. See <u>Onstead</u>, 962 F.2d at 804. Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm her decision as long as there is substantial evidence in favor of the Commissioner's position. See <u>Cox</u>, 495 F.3d at 617; <u>Krogmeier</u>, 294 F.3d at 1022.

At the time of the hearing, Plaintiff was forty-eight years old and weighed 240 pounds. (Tr. 81). Plaintiff testified that he had not had a driver's license for six or seven years because it was taken away after he received a driving while intoxicated (DWI) conviction; that he completed the twelfth grade; that he could "read pretty good"; that he left his last job because he could not perform it; that people did not want to be around him because of his anger problems; that he smoked about a package of cigarettes a day; and that his disabling conditions included bi-polar disorder, depression, a bad left leg; wrist pain, short term memory loss, difficulty sleeping, and breathing problems for which he used a CPAP machine at night. (Tr. 82-85, 88-92, 97-98).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since December 20, 2011, his application date[1]; that he had the severe impairments of posttraumatic stress disorder (PTSD), obsessive-compulsive disorder (OCD), affective disorder, and bi-polar disorder; and that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment.  The ALJ further found that Plaintiff had the following RFC:  Plaintiff could perform medium work except that he could only perform simple, routine, repetitive work with occasional contact with the public, coworkers, and supervisors; he could not engage in tasks at a production rate pace; and he had to alternate between sitting, standing, and walking every forty-five minutes at will, for a brief change, while continuing to work at the workstation.  The ALJ additionally found that Plaintiff did not have any past relevant work; that, based on Plaintiff's age, education, work experience, and RFC, there were jobs existing in significant numbers, in the national economy, which Plaintiff could perform; and that, therefore, Plaintiff was not disabled.

---

[1]  Although Plaintiff alleged disability beginning November 2009, the ALJ adjudicated his case beginning with the date of his December 2011 application because SSI is not payable prior to the application date.  (Tr. 59).  See 20 C.F.R. § 416.335 ("When you file an application in the month that you meet all the other requirements for eligibility, the earliest month for which we can pay you benefits is the month following the month you filed the application.").  Plaintiff does not take issue with the ALJ's doing so.

Plaintiff contends that the ALJ's decision is not based on substantial evidence because: The ALJ failed to accord controlling weight to the opinion of Lyle Clark, M.D., who was Plaintiff's treating psychiatrist; the ALJ erred in finding that Plaintiff's mental impairments did not meet Listing 12.04 or 12.06; and the ALJ's RFC determination was not supported by the evidence. Upon challenging the ALJ's RFC determination, Plaintiff argues that the ALJ should have found that his RFC was more restrictive than the RFC which the ALJ assigned to him. For the following reasons, the court finds that Plaintiff's arguments without merit and that the ALJ's decision is based on substantial evidence and is consistent with the Regulations and case law.

## A.     Plaintiff's Credibility:

The court will first address the ALJ's credibility findings as Plaintiff's credibility is relevant to other factors, including the weight given to opinions of record. See Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010) ("[The plaintiff] fails to recognize that the ALJ's determination regarding her RFC was influenced by his determination that her allegations were not credible.") (citing Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005)); 20 C.F.R. §§ 404.1545, 416.945 (2010). As set forth more fully above, the ALJ's credibility findings should be affirmed if they are supported by substantial evidence on the record as a whole; a court cannot substitute its judgment for that of the ALJ. See Guilliams v. Barnhart,

393 F.3d 798, 801 (8th Cir. 2005); <u>Hutsell</u>, 892 F.2d at 750; <u>Benskin</u>, 830 F.2d at 882.

To the extent that the ALJ did not specifically cite <u>Polaski</u>, other case law, and/or Regulations relevant to a consideration of Plaintiff's credibility, this is not necessarily a basis to set aside an ALJ's decision where the decision is supported by substantial evidence. <u>Randolph v. Barnhart</u>, 386 F.3d 835, 842 (8th Cir. 2004); <u>Wheeler v. Apfel</u>, 224 F.3d 891, 895 n.3 (8th Cir. 2000); <u>Reynolds v. Chater</u>, 82 F.3d 254, 258 (8th Cir. 1996); <u>Montgomery v. Chater</u>, 69 F.3d 273, 275 (8th Cir. 1995). Additionally, an ALJ need not methodically discuss each <u>Polaski</u> factor if the factors are acknowledged and examined prior to making a credibility determination; where adequately explained and supported, credibility findings are for the ALJ to make. <u>See</u> <u>Lowe v. Apfel</u>, 226 F.3d 969, 972 (8th Cir. 2000). <u>See also</u> <u>Tucker v. Barnhart</u>, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each <u>Polaski</u> factor as long as the analytical framework is recognized and considered."); <u>Strongson</u>, 361 F.3d at 1072; <u>Brown v. Chater</u>, 87 F.3d 963, 966 (8th Cir. 1996).

In any case, "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1218 (8th Cir. 2001). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the

ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003). See also Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010); Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006). For the following reasons, the court finds that the reasons offered by the ALJ in support of his credibility determination are based on substantial evidence.

First, the ALJ considered that Plaintiff engaged in a "wide-range of daily activities" and that his doing so was inconsistent with his allegations of total disability. In particular, the ALJ considered that Plaintiff did not have difficulty with personal care activities, and that he performed household repairs, mowed the lawn, and took out the trash. (Tr. 65). The court further notes that Plaintiff testified that he did some carpentry work such as installing trim and drywall, although he had not done that for the prior seven years; that more recently he had been paid to clean a garage; that he had no trouble when he went grocery shopping with his girlfriend; and that he used a computer. (Tr. 100-101, 104-105). Further, in a Function Report – Adult, dated September 27, 2010, Plaintiff said that he "messed around in the yard," fed his dogs, did household repairs and mowing, shopped for food, watched television every day, and had no problems sitting, talking, hearing, climbing stairs, seeing, using his hands, and getting along with others. (Tr. 255-60). Plaintiff's girlfriend reported, in a Function Report – Adult - Third Party, that Plaintiff did dishes, took out the trash, and swept the floors, and

that Plaintiff did not have difficulty lifting, climbing stairs, kneeling, talking, using his hands, following instructions, reaching, and seeing. (Tr. 292-97). On April 5, 2011, Plaintiff told Robert Parsonson, M.D., that he knew "how to shop and cook but '[his girlfriend] [did] most of it." He further stated: "I am not going to lose any weight – it is not happ[en]ing. I am fat and lazy. I don't give a damn. I try not to think about it." (Tr. 419). Also, Plaintiff's doctor reported, on October 2, 2012, that Plaintiff said he had been "trying to work on getting loads of wood." (Tr. 610).

While the undersigned appreciates that a claimant need not be bedridden before he can be determined to be disabled, a claimant's daily activities can nonetheless be seen as inconsistent with his subjective complaints of a disabling impairment and may be considered in judging the credibility of complaints. See McDade v. Astrue, 720 F.3d 994, 998 (8th Cir. 2013) (ALJ properly discounted plaintiff's credibility where, among other factors, plaintiff "was not unduly restricted in his daily activities, which included the ability to perform some cooking, tak[ing] care of his dogs, us[ing] a computer, driv[ing] with a neck brace, and shop[ping] for groceries with the use of an electric cart"). See also Ponders v. Colvin, 770 F.3d 1190 (8th Cir. 2014) (holding that substantial evidence supported the ALJ's denial of disability benefits in part because claimant "performs light housework, washes dishes, cooks for her family, does laundry, can handle money

and pays bills, shops for groceries and clothing, watches television, drives a vehicle, leaves her house alone, regularly attends church, and visits her family"); Buckner v. Astrue, 646 F.3d 549, 555 (8th Cir. 2011) (finding plaintiff's depression was not severe where plaintiff engaged in daily activities that were inconsistent with his allegations); Roberson v. Astrue, 481 F.3d, 1020, 1025 (8th Cir. 2007) (holding that the ALJ's denial of benefits was supported based in part because Plaintiff fixed meals, did housework, shopped for grocers, and visited friends). Moreover, to the extent Plaintiff urges the court to reweigh the evidence regarding Plaintiff's daily activities and draw its own conclusion in this regard, it is not the function of the court to do so. See Bates v. Chater, 54 F.3d 529, 531-32 (8th Cir. 1995) ("As we have stated many times, we do not reweigh the evidence presented to the ALJ, and it is the statutory duty of the ALJ, in the first instance, to assess the credibility of the claimant and other witnesses.") (internal citations, punctuation, and quotations omitted). In any case, Plaintiff's daily activities were only one of many factors considered by the ALJ when determining Plaintiff's credibility. (Tr. 64-66).

Second, the ALJ considered that Plaintiff was non-compliant with prescribed treatment. (Tr. 65). See Wildman v. Astrue, 596 F.3d 959, 964-65 (8th Cir. 2010) (noncompliance is a basis for discrediting a claimant; when claimant was compliant with dietary recommendations his pain was under good control). In this

regard, the court notes that an Annual Assessment, dated March 24, 2009, completed by Community Support Specialist Ken Norman, states that Plaintiff "failed to take his medications at times"; that Plaintiff said that "he liked the medications his girlfriend was on better than his so he would just take hers"; and that Plaintiff was "supposed to be on a[] 1800 calorie a day diet to lose weight," but that he "reported that he [did] not follow it."  (Tr. 590-91).

After seeing Plaintiff on March 28, 2011, for complaints of depression and a "high level of anxiety," Jonathan D. Colen, D.O., reported that Plaintiff described having "heavy caffeine use," which comprised of his drinking "greater than ten cups of coffee a day."  Dr. Colen opined that it was difficult to determine whether Plaintiff's anxiety was "primary anxiety disorder or substance induced from caffeine, which [was] quite possible."  When Dr. Colen recommended that Plaintiff slowly reduce his caffeine intake, Plaintiff was not interested in doing so.  (Tr. 470-71).  Additionally, Dr. Colen reported that Plaintiff's "[n]ot using the Bi-PAP could be contributing to treatment resistant depression, anxiety, and extreme irritability."  When Dr. Colen recommended that Plaintiff get a different mask for his Bi-PAP, Plaintiff "appeared to be resistant."[2]  (Tr. 475).  When Dr. Colen

---

[2]  Bi-PAP " stands for Bilevel Positive Airway Pressure, and is very similar in function and design to a CPAP machine (continuous positive airway pressure). Similar to a CPAP machine, a BiPAP machine is a non-invasive form of therapy for patients suffering from sleep apnea.  Both machine types deliver pressurized air through a mask to the patient's airways.  The air pressure keeps the throat muscles

recommended that Plaintiff discontinue alcohol, Plaintiff responded that he did not think his occasional use was a problem. Dr. Colen further reported that he was concerned with Plaintiff's asking for Xanax "which is about as close as you can get to alcohol in a pill in terms of its effects." Finally, Dr. Colen recommended that Plaintiff continue with another doctor because "he [was] not wanting to follow the treatment recommendations that" Dr. Colen had given him. (Tr. 476).

Also, in regard to Plaintiff's failure to follow medical advice, Dr. Parsonson reported, on January 17, 2012, that although Plaintiff complained of insomnia, he declined a sleep study; he also declined "PSR groups." (Tr. 619). On April 4, 2012, Dr. Parsonson reported that Plaintiff was non-compliant "again" with his medication. (Tr. 617).

On August 14, 2012, Dr. Gwan-Nulla reported that a nerve blockage procedure was recommended for Plaintiff's leg pain, but that Plaintiff refused to have the procedure. (Tr. 728). On September 4, 2012, Dr. Clark, a psychiatrist, reported it was "difficult to treat" Plaintiff and that "alcohol and/or substance abuse" were a "significant contribution to [Plaintiff's] problems." (Tr. 567). On October 2, 2012, Dr. Clark reported that Plaintiff "admitted that he was drinking a significant amount of [c]affeine and was asked to reduce this." (Tr. 610). On

from collapsing and reducing obstructions by acting as a splint. Both CPAP and BiPAP machines allow patients to breathe easily and regularly throughout the night." http://www.alaskasleep.com/blog/what-is-bipap-therapy-machine-bilevel-positive-airway-pressure (last visited 10/16/2015).

September 14, 2013, Dr. Clark reported that Plaintiff was not compliant with his Bi-PAP because he found it "annoying" and that Plaintiff "admit[ted] that he [was] not taking his medication regularly." (Tr. 699). The record also reflects that Plaintiff was repeatedly advised to stop smoking and lose weight, but that he did not follow this advice. (Tr. 672, 677, 681, 685).

Third, the ALJ considered that Plaintiff was treated with prescription medication and regular therapy and that he reported, on occasion, that his medications were effective. (Tr. 65). Conditions which can be controlled by treatment are not disabling. See Renstrom v. Astrue, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010)); Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009); Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009); Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (holding that if an impairment can be controlled by treatment, it cannot be considered disabling).

In this regard, it was reported, on July 12, 2012, that, with multiple medications, Plaintiff's blood pressure was "well controlled, even on the low side." (Tr. 678). Dr. Clark reported, on October 2, 2012, that he declined to increase Plaintiff's medication, when Plaintiff asked that he do so, and that Plaintiff said he had been doing "fair to midline." (Tr. 610). On April 10, 2012, Plaintiff told Dr. Clark that he had been "doing a little better since he increased [his] medication." (Tr. 605). In June 2013, Plaintiff told Dr. Clark that his sleep had improved

"somewhat" with the increase in his medication, and that he did not have side effects from medication. (Tr. 701). See Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003) ("We [] think that it was reasonable for the ALJ to consider the fact that no medical records during this time period mention [the claimant's] having side effects from any medication.").

To the extent Plaintiff argues that the ALJ did not consider his testimony that he had side effects from medication (Doc. 16 at 22-23), in particular Plaintiff's testimony that his medication made him dizzy and tired (Tr. 87), there is no indication that the ALJ actually failed to consider Plaintiff's testimony in this regard. See Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006) ("The fact that the ALJ did not elaborate on this conclusion does not require reversal, because the record supports her overall conclusion.") (citations omitted); Wheeler v. Apfel, 224 F.3d 891, 896 n.3 (8th Cir. 2000) (citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (holding that an ALJ is not required to discuss every piece of evidence submitted and that an "ALJ's failure to cite specific evidence does not indicate that such evidence was not considered").

Moreover, even assuming that the ALJ failed to consider Plaintiff's testimony about side effects he had from medication, given that the ALJ found Plaintiff not fully credible, there is no indication that the ALJ would have decided differently had she considered such testimony. See Welch v. Colvin, 765 F.3d

926, 929 (8th Cir. 2014) (ALJ's failure to explicitly address applicable SSR 96-9p was an arguable deficiency in opinion writing that had no practical effect on decision because ALJ found Plaintiff's limitations had no more than a slight impact on claimant's ability to perform full range of sedentary work; therefore, that was not a sufficient reason to set aside the ALJ's decision); Van Vickle v. Astrue, 539 F.3d 825, 830 (8th Cir. 2008) ("There is no indication that the ALJ would have decided differently had he read the hand-written notation to say 'walk' rather than 'work' and any error by the ALJ was therefore harmless.").

Fourth, the ALJ considered that, during the relevant period, Plaintiff never required emergency department intervention or in-patient care for his alleged psychiatric impairments. (Tr. 65). Conservative treatment is consistent with discrediting a claimant's allegation of disabling pain. Kamann v. Colvin, 721 F.3d 945, 950-51 (8th Cir. 2012) (noting that the ALJ properly considered that the claimant was seen "relatively infrequently for his impairments despite his allegations of disabling symptoms"); Casey v. Astrue, 503 F.3d 687, 693 (8th Cir. 2007) (noting that the claimant sought treatment "far less frequently than one would expect based on the [symptoms] that [he] alleged"); Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).

Fifth, the ALJ considered that the objective evidence did not support Plaintiff's allegations regarding the severity of his mental impairments. (Tr. 64).

See Social Security Ruling (SSR) 06-7p(4), 1996 WL 374186, at *1 (July 2, 1996) ("In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence," although disability determination "cannot be made solely on the basis of objective medical evidence."). Indeed, a claimant's "symptoms, including pain, will be determined to diminish [his] capacity for basic work activities to the extent that [his] alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record." Id. at *2.

In this regard, pursuant to a March 28, 2011 mental status examination, Dr. Colen reported that Plaintiff's form of thought was logical and goal-directed; that he had "absolutely no flight of ideas or circumstantiality, no tangentiality"; that he had no racing of thoughts, except for "worries at times"; that his affect was mildly flat; that no anxiety was noted in Plaintiff's "psychomotor activity, behavior and/or affect during [his] appointment"; that Plaintiff was alert and oriented; that he had no gross deficit in immediate, recent, or remote memory; that he had no gross deficit in the ability to maintain attention or concentration, in his ability to maintain attention, or in his general fund of knowledge; that Plaintiff's intelligence appeared to be in the normal range by vocabulary; and, other than his insight into

his problems with alcohol and caffeine and his not using his Bi-PAP, Plaintiff's insight and judgment appeared to be intact. (Tr. 474).

On January 11, 2012, Dr. Parsonson reported that Plaintiff was groomed, cooperative, and had a depressed mood, monotone speech, and no homicidal or suicidal ideas. (Tr. 620). On January 17, 2012, Dr. Parsonson reported that Plaintiff was groomed and cooperative "+1," had no suicidal or homicidal ideas, and had poor insight, impulse control, and judgment. (Tr. 619). On January 24, 2012, Dr. Parsonson reported that Plaintiff was groomed and cooperative and had a cooperative attitude, normal speech, organized thoughts, fair insight, and poor impulse control and judgment. (Tr. 618). On April 4, 2012, Dr. Parsonson reported that Plaintiff was groomed; that his affect was appropriate; that his speech was normal; that he had no suicidal or homicidal ideas; that his insight was fair; and that his impulse control and judgment were poor. (Tr. 617)

On June 13, 2012, pursuant to a mental status examination, Dr. Clark reported that: Plaintiff was oriented; his dress was appropriate; he was pleasant and cooperative; his answers were to the point; his speech was within normal limits; his intellect appeared to be average to below average; his memory was fair; Plaintiff's thoughts demonstrated logical associations; his mood appeared neutral; his affect was appropriate; he denied assaultive and homicidal ideation; and his insight and judgment were adequate. (Tr. 615). On July 11, 2012, Dr. Clark

reported that: Plaintiff was oriented; his demeanor was pleasant and cooperative; his thoughts demonstrated logical associations; his answers were to the point; his mood was mildly depressed; his affect was appropriate; and his insight and judgment were adequate for the situation. (Tr. 612). Dr. Clark reported, on September 4, October 2, and December 18, 2012, and February 19, 2013, that: Plaintiff was oriented; he was pleasant and cooperative; his thoughts were logical; his answers were to the point; his affect was appropriate; and his insight and judgment were adequate for the situation. (Tr. 608-11).

On April 10, 2013, Dr. Clark reported that Plaintiff was oriented; that he was pleasant and cooperative; that his insight, judgment, and hygiene were adequate; that he was pleasant and cooperative; that his answers were to the point of the question; that his thoughts demonstrated normal flow and rate with intact associations; and that he denied assaultive and homicidal ideation. (Tr. 606). Dr. Clark then reported, in June and May 2013, that Plaintiff was alert and oriented; that he was pleasant and cooperative; that his thoughts demonstrated normal rate and flow with intact associations; that his answers were to the point; that his affect was appropriate; and that his insight and judgment were adequate. (Tr. 701).

In regard to Plaintiff's alleged physical impairments, Dr. Clark reported, in June 2012, that Plaintiff had no abnormal movements. (Tr. 615). In July 2012, Meesha Gwan-Nulla, M.D., reported that, on physical examination, Plaintiff was in

no acute respiratory distress; that he had regular heart rate and rhythm; that he had no clubbing, cyanosis or edema of the extremities; that his gait and deep tendon reflexes were normal; and that his hypertension was stable and on the low side. (Tr. 678). In May and June 2013, Dr. Clark reported that Plaintiff's "movements showed no problems with tone, gait, or station." (Tr. 701-702).

Sixth, the court notes that Plaintiff's allegations were inconsistent with what he told doctors. See Karlix v. Barnhart, 457 F.3d 742, 748 (8th Cir. 2006) (contradictions between a claimant's sworn testimony and what he actually told physicians weighs against the claimant's credibility). Indeed, in June 2012, Plaintiff told Dr. Clark that he had no delusions or suicidal ideation. (Tr. 615). In April 2013, Plaintiff told Dr. Clark that he had only occasional auditory hallucinations and no delusions and that he had mild depressive ideation. Plaintiff also reported that his sleep had improved. (Tr. 606). In May and June 2013, Plaintiff told Dr. Clark that he had less depressive ideation and denied suicidal ideation. In May 2013, Plaintiff told Dr. Clark that he had been doing "fairly well"; that he was getting along better with people; and that his mood had been more stable in the prior month. (Tr. 700-701).

Seventh, the ALJ considered that there was "little evidence that [Plaintiff] experienced any significant exacerbations [of his mental conditions] during the relevant period." (Tr. 65).

Eighth, the ALJ considered Plaintiff's work history, including that he had a "very sporadic work history consisting of low wages." The ALJ stated that Plaintiff's work record drew into question Plaintiff's motivation to work and his credibility as a witness. The ALJ noted that, with his history of low wages, it was possible that Plaintiff would receive more in SSI than he earned from employment during the fifteen of his last eighteen years of employment. (Tr. 66). Indeed, Plaintiff earned nothing in 2001, $8,857.09 in 2002, nothing in 2003, $30,197.07 in 2004, $32,331.04 in 2005, $5,530.40 in 2006, $1,306.51 in 2007, and $473.81 in 2008. (Tr. 202, 205). A long and continuous past work record with no evidence of malingering is a factor supporting credibility of assertions of disabling impairments. See Allen v. Califano, 613 F.2d 139, 147 (6th Cir. 1980). For the same reason, an ALJ may discount a claimant's credibility based upon his poor work record. See Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (holding that the ALJ did not err in evaluating claimant's credibility in finding that his "sporadic work history prior to his alleged disability date" indicated that he was not strongly motivated to engage in meaningful productive activity and that this weighed against claimant's credibility regarding his alleged reasons for not working); Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005) (ALJ may properly consider claimant had not worked for several years before filing SSI application); Fredrickson v. Barnhart, 359 F.3d 972, 976 (8th Cir. 2004) (ALJ properly found

claimant not credible due in part to his sporadic work record reflecting relatively low earnings and multiple years with no reported earnings).

Ninth, the court notes that Dr. Clark reported, in June 2012, that Plaintiff's current stressors included occupational problems including problems finding work and economic problems such as paying bills and child support. (Tr. 615). In April 2013, Plaintiff's primary stressors were having a "step-son and his wife move in," occupational problems including his being unable to maintain employment, and economic problems including his being unable to pay his utility bills. (Tr. 605). Situational depression is not disabling. See Dunahoo v. Apfel, 241 F.3d 1033, 1039-40 (8th Cir. 2001) (holding that depression was situational and not disabling because it was due to denial of food stamps and workers compensation and because there was no evidence that it resulted in significant functional limitations); Shipley v. Astrue, 2010 WL 1687077, at *12 (E.D. Mo. April 26, 2010) (situational depression is not disabling).

In conclusion, the court finds that the ALJ's credibility determination is based on substantial evidence and consistent with the Regulations and case law.

## B.     Opinion of Dr. Clark:

In a Medical Source Statement of Ability to do Work-Related Activities – Mental, dated September 4, 2012, Dr. Clark opined as follows: Plaintiff was *moderately limited* in regard to understanding and remembering simple

instructions, carrying out simple instructions, and interacting appropriately with the public, supervisors, and co-workers; Plaintiff was *markedly limited* in his ability to make simple work-related decisions, understand, remember, and carry out complex instructions, make judgments on complex work-related instructions, and respond appropriately to usual work situations and changes in work settings; and Plaintiff did not have any extreme limitations. Dr. Clark also opined that Plaintiff had difficulty with changes, and that he seemed to be very confused with even small changes. (Tr. 566-67). Plaintiff argues that the ALJ's determination that only partial weight should be given to Dr. Clark's opinion is not based on substantial evidence. (Doc. 16 at 9-18). For the following reasons, the court finds that the ALJ gave proper weight to Dr. Clark's opinion and that the ALJ's decision, in this regard, is based on substantial evidence.

First, the ALJ declined to give Dr. Clark's opinion controlling weight because the medical evidence as a whole did not fully support the level of Dr. Clark's opined limitations. (Tr. 66). Where a treating doctor's opinion "is not consistent with the objective medical evidence that relates to determining disabling pain levels," an ALJ need not give the treating doctor's opinion controlling weight. Wright v. Colvin, 789 F.3d 847, 853 (8th Cir. 2015) (citing Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011) ("An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by

better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."). See also Cline v. Colvin, 771 F.3d 1098, 1103 (8th Cir. 2014) (finding ALJ properly discounted treating physician's opinion where it was inconsistent with treatment records and objective medical evidence as a whole and was not supported by the treating physician's own physical examination of the claimant and objective test results); Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) (holding that if a doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight).

Second, the ALJ considered that portions of Dr. Clark's opinion were consistent with the medical evidence, and, as such, the ALJ accommodated these portions of Dr. Clark's opinion in Plaintiff's RFC. Specifically, the ALJ accepted the moderate limitations found by Dr. Clark and incorporated those limitations in Plaintiff's RFC, as the ALJ limited Plaintiff to simple, routine, repetitive work that did not involve a production-rate pace. (Tr. 61, 63). See Choate v. Barnhart, 457 F.3d 865, 869-70 (8th Cir. 2006) (holding that the limitations imposed by the ALJ as reflected in the claimant's RFC demonstrate that the ALJ gave some credit to the opinions of the treating physicians); Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) ("In assessing [the claimant's] RFC, the ALJ determined that [the claimant] could sit for a total of six hours and stand for a total of two hours, but was limited

to sedentary work. This in itself is a significant limitation, which reveals that the ALJ did give some credit to [the treating doctor's] medical opinions.").

Third, the court notes that the marked limitations imposed by Dr. Clark are inconsistent with his own treatment notes. See Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (holding that a treating physician's opinion does not automatically control or obviate the need to evaluate the record as whole and upholding the ALJ's decision to discount the treating physician's medical-source statement where limitations were never mentioned in numerous treatment records or supported by any explanation); Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment). In particular, although Dr. Clark opined that Plaintiff had marked limitations in regard to his making judgments and work-related decisions and in his ability to respond appropriately to work situations, as discussed above in regard to Plaintiff's credibility, Dr. Clark frequently reported that Plaintiff had appropriate dress, normal speech, average intellect, intact memory, logical thoughts, a pleasant and cooperative attitude, and no violent thoughts. (Tr. 64, 605, 609-12, 700-01). Notably, courts have held that normal findings pursuant to a mental status examination are a sufficient basis upon which an ALJ may discredit a treating doctor's opinion that a claimant is disabled. See, e.g., Mitchell v. Colvin, 2014

WL 65386, at *28 (E.D. Mo. Jan. 8, 2014) (unpublished) (referring to "normal mental status examinations" demonstrating "only mild to moderate symptoms" as substantial evidence to support ALJ's RFC determination); Boling v. Astrue, 2012 WL 1898783, at *4 (W.D. Mo. May 23, 2012) (unpublished) (referring to normal mental status examination as substantial evidence supporting ALJ's decision to discount treating physician's opinion). Moreover, Dr. Clark frequently reported that Plaintiff was non-compliant with treatment recommendations. (Tr. 610, 672, 677, 681, 699, 728).

Fourth, the marked limitations imposed by Dr. Clark were inconsistent with the findings of other medical sources of record. Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) ("A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.") (internal quotation and citation omitted). As discussed above, Dr. Colen reported, pursuant to examination, that Plaintiff had no gross deficits in regard to memory and the ability to maintain attention; that he had a logical and goal-directed thought process; that he did not have flight of ideas; that he was alert and oriented; and that his insight and judgment were intact with exceptions regarding his alcohol use and Bi-PAP use. (Tr. 474). Also, when

Plaintiff was compliant with his medication, Dr. Parsonson reported that Plaintiff was less depressed and slept well.  (Tr. 618).

Fifth, to the extent Plaintiff argues that the ALJ erred in discounting the Global Assessment of Functioning Score (GAF) of 40[3] which Dr. Clark assigned to Plaintiff (Doc. 16 at 17-18), as considered by the ALJ, the Commissioner has declined to endorse the GAF scale for use in Social Security disability programs because of a lack of correlation between GAF scores and the severity of the mental disorder listings.  (Tr. 65).  See Jones v. Astrue, 619 F.3d 963, 974-75 (8th Cir. 2010) ("[T]he Commissioner "has declined to endorse the [Global Assessment Functioning] score for 'use in the Social Security and [Supplemental Security

---

[3] GAF is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations.  See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 30-32 (4th ed. 1994).  Expressed in terms of degree of severity of symptoms or functional impairment, GAF scores of 31 to 40 represent "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," 41 to 50 represents "serious," scores of 51 to 60 represent "moderate," scores of 61 to 70 represent "mild," and scores of 90 or higher represent absent or minimal symptoms of impairment.  Id. at 32.  See also Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) ("[A] GAF score of 65 [or 70] . . . reflects 'some mild symptoms (e.g. depressed mood or mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships.'") (quoting Kohler v. Astrue, 546 F.3d 260, 263 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) (alterations in original).  See also Goff, 421 F.3d at 791, 793 (affirming where court held GAF of 58 was inconsistent with doctor's opinion that claimant suffered from extreme limitations; GAF scores of 58-60 supported ALJ's limitation to simple, routine, repetitive work).

Income] disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'") (quoting Wind v. Barnhart, 133 Fed. Appx. 684, 692 n.5 (11th Cir. 2005) (quoting 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)).

Indeed, on a form titled "Individual Treatment & Rehabilitation Plan," dated April 25, 2012, Dr. Clark assessed Plaintiff's GAF as 44, indicating severe symptoms. Also, pursuant to June 13, 2012 psychiatric evaluation, Dr. Clark reported that Plaintiff had a GAF of 42, but he also reported, on this same date, that Plaintiff was alert and oriented, dressed appropriately, had adequate hygiene, was pleasant and cooperative, showed no obvious movement abnormalities, had speech which was within normal limits, had answers which were to the point of the question, had average to below average intellect, had fair memory and thoughts which demonstrated logical associations, and had appropriate affect, neutral mood, and adequate insight and judgment. Plaintiff also denied suicidal, assaultive, and homicidal ideation. (Tr. 615). See Cline v. Colvin, 771 F.3d 1098, 1103 (8th Cir. 2014) (finding ALJ properly discounted treating physician's opinion where it was not supported by the treating physician's own physical examination of the claimant). On April 10, 2013, Dr. Clark stated that Plaintiff's GAF was 43, despite reporting, on that same date, that Plaintiff was alert and oriented; that his dress was appropriate; that his hygiene was adequate; that Plaintiff was pleasant and

cooperative; and that he had normal speech; average to below average intellect, fair memory, normal flow of thought and intact associations, appropriate affect, and adequate insight and judgment. Also, Plaintiff denied suicidal, assaultive, and homicidal ideation and his answers were to the point of the question. Significantly, Dr. Clark noted, on this date, that Plaintiff admitted only mild depressive ideation, occasional auditory hallucinations, and no delusions. (Tr. 606).

Fifth, to the extent Dr. Clark opined that Plaintiff had marked limitations, he did so by making checkmarks on a form. See Cline v. Colvin, 771 F.3d 1098, 1104 (8th Cir. 2014) (treating doctor's "cursory checklist statement" included "significant impairments and limitations" which were absent from treatment notes) (citing Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010) (concluding the commissioner "properly discounted" a treating physician's opinion that "consist[ed] of three checklist forms, cite[d] no medical evidence, and provide [d] little to no elaboration").

Sixth, the court notes that upon determining the weight to be given Dr. Clark's opinion, the ALJ was fulfilling his roll to evaluate the record as a whole. See Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (holding that a treating physician's opinion does not automatically control or obviate the need to evaluate the record as whole); Tindell v. Barnhart, 444 F.3d 1002, 1004 (8th Cir. 2006) ("'It is the ALJ's function to resolve conflicts among the various treating and examining

34

physicians.'").  Moreover, to the extent the ALJ did not give Dr. Clark's entire opinion great or controlling weight, the ALJ stated good reasons for his doing so. See King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984) (holding that the ALJ is not bound by conclusory statements of total disability by a treating physician where the ALJ has identified good reason for not accepting the treating physician's opinion, such as its not being supported by any detailed, clinical, or diagnostic evidence).  In conclusion, the court finds that substantial evidence supports the weight the ALJ gave to Dr. Clark's opinion, and that the ALJ's decision, in this regard, is consistent with the Regulations and case law.

**C.    ALJ's Consideration of Plaintiff's Mental Impairments at Step Three:**

The court first notes that 20 C.F.R. Ch. lll, Pt. 404, Supt. P, App.1 § 12.00(a) states, in relevant part, that:

> The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months.

Section 12.00(a) further lists mental disorders in diagnostic categories, which include, as relevant, affective disorders (Listing 12.04) and anxiety-related disorders (Listing 12.06).  The Commissioner has supplemented the familiar five-step sequential process for generally evaluating a claimant's eligibility for benefits with additional regulations dealing specifically with mental impairments.  20

C.F.R. § 404.1520a. A special procedure must be followed at each level of administrative review. See Pratt v. Sullivan, 956 F.2d 830, 834 n.8 (8th Cir. 1992) (per curiam).

The mere existence of a mental condition, however, is not per se disabling. See Dunlap v. Harris, 649 F.2d 637, 638 (8th Cir. 1981). The sequential process for evaluating mental impairments is set out in 20 C.F.R. § 404.1520a. This Regulation states that the steps set forth in § 404.1520 also apply to the evaluation of a mental impairment. 20 C.F.R. § 404.1520a(a). However, other considerations are included. The first step is to record pertinent signs, symptoms, and findings to determine if a mental impairment exists. 20 C.F.R. § 404.1520a(b)(1). These are gleaned from a mental status exam or psychiatric history and must be established by medical evidence consisting of signs, symptoms, and laboratory findings. 20 C.F.R. §§ 404.1520a(b)(1).

If a mental impairment is found, the ALJ must then analyze whether certain medical findings relevant to ability to work are present or absent. 20 C.F.R. § 404.1520a(b)(1). The procedure then requires the ALJ to rate the degree of functional loss resulting from the impairment in four areas of function which are deemed essential to work. 20 C.F.R. § 404.1520a(c)(2). Those areas are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or

pace; and (4) deterioration or decompensation in work or work-like settings. 20 C.F.R. § 404.1520a(c)(3).

The limitation in the first three functional areas of activities of daily living (social functioning and concentration, persistence, or pace) is assigned a designation of either "none, mild, moderate, marked, [or] extreme." 20 C.F.R. § 404.1520a(c)(4). The degree of limitation in regard to episodes of decompensation is determined by application of a four-point scale: "None, one or two, three, four or more." Id. When "the degree of []limitation in the first three functional areas" is "none" or "mild" and "none" in the area of decompensation, impairments are not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in [a claimant's] ability to do basic work activities." 20 C.F.R. § 404.1520a(d)(1). When it is determined that a claimant's mental impairment(s) are severe, the ALJ must next determine whether the impairment(s) meet or are equivalent in severity to a listed mental disorder. This is done by comparing the medical findings about a claimant's impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder. See 20 C.F.R. § 404.1520a(d)(2). If it is determined that a claimant has "a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing," the ALJ must then assess the claimant's RFC. 20 C.F.R. § 404.1520a(d)(3).

The ALJ in the matter under consideration found that the severity of Plaintiff's mental impairments did not meet or medically equal the criteria for Listings 12.04 or 12.06. In this regard, the ALJ considered Plaintiff's daily activities, as described above in regard to Plaintiff's credibility, including that he was able to complete household repairs and did not have difficulty with personal care activities, and concluded that Plaintiff had a mild restriction in this area. (Tr. 62, 256-57, 294, 296, 309-11, 583). Plaintiff argues that he had a marked limitation in regard to activities of daily living because, at times, his hygiene was fair to poor. (Doc. 16 at 20). Plaintiff reported, however, in April 2012, that he showered and put on clean clothing daily and that he washed his hands two to four times a day. (Tr. 586-87). Additionally, as set forth above, it was frequently reported that Plaintiff was adequately groomed and dressed. (Tr. 417, 605, 617-20, 639-40). See Buckner, 646 F.3d at 555 (finding plaintiff's depression was not severe where plaintiff engaged in daily activities that were inconsistent with his allegations). In any case, the record does not reflect that, when Plaintiff was not well groomed, it was due to a mental impairment. The court finds, therefore, that the ALJ's determination that Plaintiff had only a mild limitation in regard to activities of daily living is based on substantial evidence.

As for social functioning, the ALJ found that Plaintiff had a moderate limitation. In reaching this conclusion, the ALJ considered that, although Plaintiff

testified that he had difficulty getting along with others, he was able to maintain a relationship with his girlfriend and had never been fired or laid off from a job because of difficulties getting along with people. The ALJ further considered notes from Plaintiff's treatment providers, including their reports that Plaintiff had normal speech and the ability to discuss problems. (Tr. 62-63, 85-86). Further, as discussed above, Plaintiff was routinely described as alert, pleasant, cooperative, and making good eye contact. Additionally, he was comfortable discussing his problems with his mental health care providers. (Tr. 63, 345, 419, 464, 588, 605, 609-12, 615, 618, 620, 641, 699, 700-01). The court finds, therefore, that the ALJ's decision that Plaintiff had only a moderate limitation in the area of social functioning is based on substantial evidence.

In the area of concentration, persistence, or pace, the ALJ found that Plaintiff had a moderate limitation. (Tr. 63). In this regard, the ALJ considered that Plaintiff reported that he could count change, use a checkbook, and complete money orders. (Tr. 311-12). The ALJ also considered that, although Plaintiff reported that he had difficulty following both written and spoken instructions, he did not report any difficulties following television programs. (Tr. 63, 308, 311-13). Notably, as discussed above, Plaintiff's mental health care providers repeatedly reported that he was alert and oriented and had logical thoughts, normal speech, and intact memory. Further, Plaintiff reported, in March 2009, that he was

working "under the table"; that, during the prior year, he had cut firewood once or twice a week; and that he worked on vehicles and did general labor on farms on an average of seven hours a week. (Tr. 576, 583). The court finds, therefore, that the ALJ's determination that Plaintiff had only moderate limitations in concentration, persistence, or pace is based on substantial evidence. Further, the court finds that the ALJ's determination that Plaintiff had no episodes of decompensation, which had been of an extended duration, is based on substantial evidence. (Tr. 63).

To the extent Plaintiff argues that the ALJ did not consider the fluctuating nature of his bipolar symptoms (Doc. 14 at 20), the court notes that the ALJ did consider Plaintiff's testimony that his depression "kick[ed] in every now and then" and that Plaintiff reported having manic episodes which involved his becoming very angry for five to seven hours. (Tr. 64, 85). Nonetheless, as discussed above, the ALJ found Plaintiff's allegations regarding the severity of his symptoms not fully credible, and the court has found the ALJ's credibility determination is based on substantial evidence. Additionally, as discussed in regard to Plaintiff's credibility, Plaintiff engaged in extensive daily activities, continued work activity, and benefited from treatment. Because Plaintiff did not have a marked limitation in any area of functioning and because he had no qualifying episodes of decompensation, the court further finds that the ALJ's determination that Plaintiff did not meet Listings 12.04 or 12.06 is based on substantial evidence. (Tr. 63).

The Regulations define RFC as "what [the claimant] can do" despite his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a). "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). See also Myers v. Colvin, 721 F.3d 521, 526 (8th Cir. 2013).

Significantly, the ALJ in the matter under consideration identified Plaintiff's functional limitations and restrictions and then assessed his work-related abilities on a function-by-function basis. See Masterson, 363 F.3d at 737; Harris v. Barnhart, 356 F.3d 926, 929 (8th Cir. 2004). Upon formulating Plaintiff's RFC, the ALJ accommodated Plaintiff's impairments, both mental and physical, to the extent the ALJ found such limitations credible. See Tindell v. Barnhart, 444 F.3d 1002, 1007 (8th Cir. 2006) ("The ALJ included all of Tindell's credible limitations in his RFC assessment, and the ALJ's conclusions are supported by substantial evidence in the record."). To accommodate Plaintiff's credible mental impairments, the ALJ limited Plaintiff to doing only simple, routine, and repetitive

work with only occasional contact with the public, coworkers, and supervisors. Moreover, Plaintiff could not engage in tasks at a production rate of pace. (Tr. 63). As for Plaintiff's credible physical impairments, the ALJ limited Plaintiff to medium work with his alternating between sitting, standing, and walking every forty-five minutes at will, for a brief change, while continuing to work at the workstation. The court finds that the ALJ's RFC determination is based on substantial evidence and consistent with the Regulations and case law.

The ALJ concluded that Plaintiff could not perform his past-relevant work. As such, she submitted a hypothetical to a VE which described a person of Plaintiff's age and with Plaintiff's RFC, education, and work experience. To the extent Plaintiff suggests that the ALJ's hypothetical to the VE was flawed, the ALJ was only required to include in the hypothetical those limitations which he found credible. See Renstrom v. Astrue, 680 F.3d 1057, 1067 (8th Cir. 2012); Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) ("The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole."); Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999) (holding that the ALJ need not include additional complaints in the hypothetical not supported by substantial evidence).

The VE testified that given these factors stated in the hypothetical there was work available in significant numbers in the national economy which Plaintiff

could perform, including laundry worker, collator, and office helper. (Tr. 111-13). Because the hypothetical question which the ALJ posed to the VE precisely set forth all of Plaintiff's physical and mental impairments, the VE's testimony constitutes substantial evidence supporting the ALJ's decision. Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) ("Based on our previous conclusion . . . that 'the ALJ's findings of [the claimant's] RFC are supported by substantial evidence,' we hold that '[t]he hypothetical question was therefore proper, and the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits.'") (quoting Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006)); Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008) (holding that a VE's testimony is substantial evidence when it is based on an accurately phrased hypothetical capturing the concrete consequences of a claimant's limitations). Because there was work that Plaintiff could perform, the court finds that the ALJ's conclusion that Plaintiff was not disabled is based on substantial evidence.

## IV.
## CONCLUSION

For the reasons set forth above, the court finds that substantial evidence, on the record as a whole, supports the Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by Plaintiff in his Complaint and Brief in Support of Complaint (Docs. 1, 16) is **DENIED**;

**IT IS ORDERED** that a separate judgment be entered incorporating this Memorandum and Order.

Dated this 29th day of December, 2015.

/s/ Noelle C. Collins
UNITED STATES MAGISTRATE JUDGE